# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

T.T., et al.,

      Plaintiffs,

        v.

DISTRICT OF COLUMBIA, et al.,

      Defendants.

</td><td>

Civil Action No.  06-0207 (JDB)

</td></tr>
</table>

## MEMORANDUM OPINION

Plaintiffs T.T., a minor, and her mother, Norma Gales ("Gales"), have brought this action against defendants the District of Columbia and Clifford B. Janey, Superintendent of the District of Columbia Public Schools ("DCPS"), pursuant to the Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA"), 20 U.S.C. §§ 1400-1482 (Supp. 2007),[1] and the Rehabilitation Act, 29 U.S.C. § 794 (1999).  Plaintiffs appeal from an adverse administrative decision rejecting their claim that defendants violated the IDEIA by failing to provide T.T. with a free appropriate public education ("FAPE").  Presently before the Court are the parties' cross-motions for summary judgment.  For the reasons set forth below, the Court concludes that defendants fulfilled their statutory obligation in providing a FAPE, and will accordingly deny plaintiffs' summary judgment motion and grant defendants' cross-motion.

---

[1] In addition to the IDEIA, plaintiffs also refer to the Individuals with Disabilities Education Act ("IDEA"), which was amended on December 3, 2004 by the IDEIA.  Those amendments, for the most part, took effect on July 1, 2005.  See Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, § 302, 118 Stat. 2647, 2803 (2004).  Because the events of this case occurred after the amendments became effective, the IDEIA is the appropriate statutory framework.

## BACKGROUND

T.T. was, at the time this case was filed, a nine-year-old emotionally-disturbed student

receiving special education services provided by DCPS.  Administrative Record ("A.R.") 3.  On

August 2, 2005, DCPS convened a multi-disciplinary team ("MDT") meeting for the purposes of

assessing T.T.'s continuing eligibility for special education services and developing her

Individual Education Program ("IEP").  A.R. 263.  In attendance at the August 2, 2005, MDT

meeting were Gales, T.T.'s educational advocate, a speech pathologist, a school psychologist, an

IEP developer, a Local Education Agency ("LEA") special education coordinator, and a social

worker.  Id.  At that meeting, the MDT determined that T.T. should receive full-time out-of-

general education, equaling thirty-two hours per week of specialized instruction and therapeutic

services.  A.R. 248.  Although the MDT believed that T.T.'s IEP could be implemented at Payne

Elementary School, where she attended the previous two academic years, Gales and the

educational advocate in attendance requested another placement.  A.R. 270.  They were

disappointed in T.T.'s progress at Payne, and suggested that T.T. would benefit from a full-time

setting with crisis intervention services and a psychologist on staff.  A.R. 268.  Moreover, Gales

specifically recommended that T.T. be placed at Accotink Academy or the Kennedy Institute,

both private educational entities offering services to students with disabilities.  A.R. 270.  The

MDT agreed that T.T. would be placed somewhere other than Payne to better suit her needs.

A.R. 268.

The LEA special education coordinator then sent T.T.'s IEP and evaluations to DCPS's

Site Review Committee ("SRC"), which was charged with identifying at least one available

placement capable of implementing her IEP.  A.R. 70, 327.  The SRC identified two available,

non-private, full-time placements options, Hamilton Center and Taft Center, the names of which were returned to the special education coordinator. A.R. 70.

On August 25, 2005, the MDT convened again to discuss the SRC's placement recommendations and make a determination as to T.T.'s placement for the 2005-2006 academic year. A.R. 69. Present at this second meeting were Gales, the educational advocate, the LEA special education coordinator, the school psychologist, the social worker, and a special education teacher. Id. The MDT informed Gales that both Hamilton and Taft were appropriate placements for T.T., A.R. 312, and briefly described the programs at Hamilton and Taft, noting the full-time social workers and psychologists on staff, crisis intervention services, small classroom settings, and certified special educators. A.R. 70. Furthermore, Gales was given the address and phone number for both Hamilton and Taft so that she could visit each site and determine which placement she would prefer for T.T. A.R. 307-09. Because Gales had not had a chance to visit either Hamilton or Taft prior to the August 25th MDT placement meeting, the MDT issued a Prior Notice of Placement ("PNOP") to Gales for both schools in preparation for T.T.'s arrival at either on the first day of the academic year, August 29, 2005. A.R. 72, 73, 309.

Gales, however, did not visit Hamilton or Taft, nor did she express a preference for one of the two schools. A.R. 309, 318. Instead, Gales told the special education coordinator that she would not visit Hamilton or Taft because she preferred to have T.T. placed by DCPS at Accotink Academy. A.R. 309, 314, 318. The special education coordinator contacted Gales, her educational advocate, and her attorney in an attempt to convene another MDT meeting in order to make a final determination as to T.T.'s placement, but another meeting was never held. A.R. 322-23. When Gales did not provide DCPS personnel with her choice between Hamilton and Taft

-3-

before the start of the academic year, the special education coordinator determined that Hamilton was the most appropriate placement because the site could meet T.T.'s needs as stated in her August 2, 2005 IEP, and was also closest to T.T.'s home.  A.R. 70, 321.

Instead of attending Hamilton on the first day of school, T.T. returned to Payne.  A.R. 309.  By that time, however, Payne was unable to implement the requirements of T.T.'s August 2, 2005 IEP.  A.R. 309-10.  On September 2, 2005, the special education coordinator issued a letter to Gales informing her that Hamilton had been chosen for T.T.'s placement, reminding Gales that T.T. had not yet been registered at Hamilton, and discussing arrangements for T.T.'s transportation to Hamilton.  A.R. 46-47, 310.  Four days later, while T.T. was still enrolled at Payne, Gales filed a due-process complaint with the Student Hearing Office asserting a number of procedural failures on the part of DCPS that allegedly constituted a denial of a FAPE.  A.R. 31-35.  Gales then removed T.T. from Payne and enrolled her at Washington Academy Public Charter School, a placement not discussed with the MDT, on September 8, 2005.  A.R. 5.  After an unsuccessful informal resolution meeting on September 20, 2005, A.R. 58, Gales's complaint proceeded to a due-process hearing on October 31, 2005.  A.R. 29.  The hearing officer concluded in his November 7, 2005 determination ("HOD") that, based on the evidence in the administrative record, "DCPS complied with IDEA and did not deny a FAPE to [T.T.]" in selecting Hamilton as the most appropriate placement.  A.R. 6.

Plaintiffs bring this civil action to challenge the HOD, setting forth three counts in their Complaint: (I) defendants failed to provide a FAPE in violation of the IDEIA and Section 504 of the Rehabilitation Act; (II) defendants violated the IDEIA by denying Gales an opportunity to participate meaningfully in the placement decision and by failing to consider Gales's school

choice; and (III) defendants violated the IDEIA by failing to comply with procedural requirements regarding the issuance of a PNOP.  Defendants oppose plaintiffs' motion for summary judgment and cross-move for summary judgment, asserting that they fulfilled their obligations under the IDEIA.  First, defendants contend that Gales meaningfully participated in the placement decision by playing an active role at the MDT meetings, one of which was convened specifically to assist Gales in making the final placement determination.  Second, defendants argue that they complied with the IDEIA when they selected an appropriate placement for T.T. at a public site capable of implementing her IEP.  For ease of organization, the Court will first analyze the meaningful-participation issue raised in Counts II and III.

## STANDARD OF REVIEW

Under the IDEIA, "any party aggrieved by the findings and decision" rendered during administrative proceedings may "bring a civil action" in state or federal court without regard to the amount in controversy.  20 U.S.C. § 1415(i)(2), (i)(3)(A); 34 C.F.R. § 300.516(a) (2006). The reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); 34 C.F.R. § 300.516(c).  On review of an HOD, the burden of proof falls upon the party challenging the administrative determination, who must "'at least take on the burden of persuading the court that the hearing officer was wrong.'"  Reid ex rel. Reid v. District of Columbia, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting Kerkam v. McKenzie, 862 F.2d 884, 887 (D.C. Cir. 1988)).

The preponderance-of-the-evidence standard of review, the Supreme Court has held, does

not authorize unfettered de novo review.  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982).  Rather, consideration of the record impliedly requires courts to give "due weight" to the administrative proceedings, id., and "[f]actual findings from the administrative proceeding are to be considered prima facie correct," S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003).  Therefore, courts may not substitute their own views for those of the hearing officer, see Rowley, 458 U.S. at 206; Shaw v. District of Columbia, 238 F. Supp. 2d 127, 135 (D.D.C. 2002), and a court upsetting a hearing officer's decision "must at least explain its basis for doing so," Kerkam, 862 F.2d at 887.  At the same time, "the district court's authority to 'hear additional evidence at the request of a party,' and 'bas[e] its decision on the preponderance of the evidence' . . . 'plainly suggest[s] less deference than is conventional' in administrative proceedings." Reid, 401 F.3d at 521 (quoting Kerkam, 862 F.2d at 887).  Where, as here, no additional evidence is introduced in a civil suit seeking review of an HOD, a motion for summary judgment operates as a motion for judgment based on the evidence comprising the record.  20 U.S.C. § 1415(i)(2)(C); Heather S. v. Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997).

## DISCUSSION

**A. IDEIA Framework**

In order to receive federal funds for education, a state must ensure that "a free appropriate public education [FAPE] is available to all children with disabilities residing in the State." 20 U.S.C. § 1412(a)(1)(A).  A FAPE is provided through the development and implementation of an Individual Education Program ("IEP") for each student.  See generally Winkelman v. Parma City Sch. Dist., 550 U.S. --, 127 S. Ct. 1994, 2000-01 (2007).  The IEP describes the student's

present academic level, determines the student's educational goals, and sets out required educational and related services, including the extent of the student's participation in a regular classroom. 20 U.S.C. §§ 1414(d)(1)(A); 34 C.F.R. § 300.320(a). A student's IEP is developed by a team that includes the student's parents, a regular education teacher, a special education teacher, a representative of the school district, an individual who can interpret evaluation results, personnel with particular knowledge of the student if applicable, and sometimes the student herself. 20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.321(a). In this case, the analogous group convened to develop T.T.'s IEP is known as the multi-disciplinary team ("MDT"). See A.R. 263.

Once developed, the IEP is then implemented through appropriate placement in an educational setting suited to the student's needs. See Roark ex rel. Roark v. District of Columbia, 460 F. Supp. 2d 32, 35 (D.D.C. 2006). The IDEIA requires that the parents of a student with a disability be members of any group making a decision regarding the student's placement. 20 U.S.C. § 1414(e); 34 C.F.R. § 300.327. The placement decision, in addition to conforming to a student's IEP, should also consider the least restrictive environment and a setting closest to the student's home. 34 C.F.R. § 300.116(a), (b).

A parent dissatisfied with the IEP developed for his or her child has a right to a due process hearing conducted by the state or local education agency before an impartial hearing officer. 20 U.S.C. §§ 1415(f)(1), (3). The determination of the hearing officer is a final decision, and any party aggrieved by a HOD may challenge it in a civil action. Id. §§ 1415(i)(1), (2). In evaluating whether a HOD was wrong, and ultimately whether a FAPE has been denied, the Supreme Court has established a two-part test to guide the analysis: "First, has the State complied with the procedures set forth in the [IDEIA]? And second, is the individualized educational

program developed through the [IDEIA]'s procedures reasonably calculated to enable the child to receive educational benefits?"  Rowley, 458 U.S. at 206-07.  If these requirements are met, the Court explained, then defendants have "complied with the obligations imposed by Congress and the courts can require no more."  Id. at 207.

**B. Procedural Compliance**

Plaintiffs allege a number of procedural failures on defendants' part, citing to Fourth Circuit case law to support their contention that procedural non-compliance is tantamount to a denial of a FAPE.  Pls.' Mot. for Summary Judgment ("Pls.' Mot.") at 9.  That is not, however, the law of this circuit.  To the contrary, the D.C. Circuit has held that procedural violations are actionable only if they affect the student's substantive rights.  Lesesne v. District of Columbia, 447 F.3d 828, 834 (D.C. Cir. 2006); accord Kingsmore ex rel. Lutz v. District of Columbia, 466 F.3d 118, 119 (D.C. Cir. 2006) (per curiam); Schoenbach v. District of Columbia, 309 F. Supp. 2d 71, 79 (D.D.C. 2004).  But before reaching the question of substantive harm, the Court must evaluate the record as it stood before the hearing officer to determine whether defendants violated the procedural requirements of the IDEIA.

**1. Meaningful Participation**

Plaintiffs' primary and overarching allegation is that Gales did not have a chance to participate meaningfully in T.T.'s placement determination.  See Pls.' Mot. at 7-8.  The regulations require that "the parents of a child with a disability [] be afforded an opportunity to participate in meetings with respect to . . . [the] educational placement of the child."  34 C.F.R. § 300.501(b)(1); see also 20 U.S.C. § 1414(e).  Plaintiffs premise their claim on their view that the Site Review Committee ("SRC") was the body that officially determined T.T.'s placement.

-8-

See Pls.' Mot. at 7-8.  Gales was not a member of the SRC, and plaintiffs thus contend that the
placement decision violated the regulatory requirement of parental participation.  The placement
determination was the responsibility of the MDT, which included Gales, but plaintiffs assert that
defendants "delegated the duty of the MDT to the [SRC]," depriving Gales of her parental right to
meaningful participation.  Id. at 7.

     Plaintiffs' contention that the SRC made the final placement determination without
parental participation is simply not supported by the record.  This argument appears to stem from
notes taken by a DCPS representative during the August 25, 2005 meeting.  The SRC was
described in those notes as having "determined the location . . . . " A.R. 70.  This inexact
description notwithstanding, the record reflects that Gales was participating meaningfully in the
placement process as early as August 2, 2005, when she took part in the development of T.T.'s
IEP at the MDT meeting, and when she informed the MDT of her desire to remove T.T. from
Payne and place her at either Accotink Academy or the Kennedy Institute.  A.R. 270; see also
Paolella v. District of Columbia, 210 F. App'x 1, 3 (D.C. Cir. 2006) (unpublished) (finding that
parent participated meaningfully in student's placement determination in part by helping to
develop the student's IEP and informing DCPS of his educational level and placement
preferences).

     Once an IEP was developed, the SRC's responsibility with regard to T.T.'s placement was
"identification" of a site or sites "that would meet the student's needs and the site which was
closest to her home." A.R. 70; see also A.R. 317.  Indeed, the IDEIA and its implementing
regulations, by which defendants are bound, require that a student with disabilities be placed in a
setting where his or her IEP can be implemented, and which is closest to his or her home.  See 34

C.F.R. § 300.116(b); see also 20 U.S.C. § 1412(a)(5); A.R. 321.  The SRC here identified two

sites -- Hamilton and Taft -- that met these regulatory requirements and also had available space

to accommodate T.T.  See A.R. 70, 321.  In defendants' typical placement process, the SRC's

placement recommendations are then "offer[ed] to the parent" during an MDT placement

meeting.  A.R. 315.  The MDT placement meeting on August 25, 2005 was convened to discuss

the two appropriate and available placement sites identified by the SRC.  See A.R. 70-71.  In fact,

because the SRC had identified more than one possible placement, "location was the only issue

left to be determined" at the August 25, 2005 MDT meeting.  A.R. 71 (emphasis added).  Gales

was given information regarding the services offered at each location, and was also provided the

addresses and phone numbers for both schools so that she could visit each before selecting one

for T.T.'s placement.  A.R. 70.  At the end of the August 25, 2005 MDT placement meeting, the

other members of the MDT requested that "the parent and advocate . . . make a decision about

placement in a timely manner so that the student can be placed at the site by the beginning of the

school year and receive services."  A.R. 71.  The authority to make the final placement

determination did not belong to the SRC, but was rather assigned to Gales with the assistance of

the MDT.

Plaintiffs also decry the undisputed fact that "no follow-up MDT placement meeting

occurred [after August 25, 2005] to discuss all the placement options, including Accotink and

Kennedy Center and conclude on T.T.'s placement . . . ."  Pls.' Mot. at 8-9.  Although plaintiffs

make this point seemingly to assign blame to defendants for the alleged loss of an additional

opportunity for parental participation, the record establishes that defendants made an effort to

assemble another meeting.  The special education coordinator contacted Gales, her educational

advocate, and her attorney in an effort to convene just such a meeting, but received little cooperation. A.R. 322-23. When contacted by the special education coordinator, Gales stated that T.T. would not be placed at either Hamilton or Taft. A.R. 322. Furthermore, as far into the academic year as September 20, 2005, defendants were willing to convene an MDT meeting to review T.T.'s evaluations and IEP, A.R. 57, while Gales continued to insist at that time that placement at Accotink Academy was the only acceptable resolution. A.R. 56. The lack of an additional MDT meeting, even if not solely attributable to plaintiffs' obstinance, plainly was not the result of a procedural failure on defendants' part.

In their most sweeping argument in support of their claim that they were unable to participate meaningfully, plaintiffs present what appears to be a blanket challenge to "the processes by which special education students are placed in schools in the District of Columbia." Pls.' Mot. at 7. Plaintiffs rely on Briere v. Fair Haven Grade Sch. Dist., 948 F. Supp. 1242 (D. Vt. 1996), in which the district court concluded that the plethora of procedural violations committed by the school officials so "inhibited meaningful parental participation" that the "violations constitute[d] a denial of a free appropriate public education per se." Id. at 1255. There, the mother of Betsy Briere, a special education student, was dissatisfied with Betsy's placement in mainstream classes at the outset of high school. Id. at 1247. After lodging several administrative objections to no avail, the mother unilaterally placed Betsy at a private school in another state, and brought suit seeking tuition reimbursement from the school district. Id. at 1248. The district court found that defendants had committed significant procedural violations, including failure to develop an appropriate IEP for Betsy, id. at 1254, and failure to provide private school tuition reimbursement when appropriate public placement within the state was

-11-

unavailable, id. at 1249.  Hence, Briere presents an extreme case far removed from the present

setting.  For one thing, Gales approved of the IEP developed for T.T.  A.R. 303.  Furthermore,

Hamilton and Taft were appropriate placements close to plaintiffs' home and capable of

implementing T.T.'s IEP.  A.R. 70.  Defendants' conduct here, in short, does not rise to the level

of the egregious procedural failings condemned in Briere.  To the contrary, a review of the record

here confirms that defendants did not prevent plaintiffs from participating meaningfully in the

placement decision for T.T.

**2. Written Prior Notice**

Plaintiffs also claim that defendants violated IDEIA procedural requirements by not

properly explaining their decision to place T.T. at Hamilton and their refusal to place T.T. at

Accotink Academy.  See Pls.' Mot. at 10.  The statute and regulations require the Local Education

Agency ("LEA") to provide written notice to parents before they initiate or refuse a change in a

student's identification, evaluation, or educational placement.  20 U.S.C. § 1415(b)(3); 34 C.F.R.

§ 300.503(a).  Specifically, the written notice must contain:

> (A) a description of the action proposed or refused by the agency;
> (B) an explanation of why the agency proposes or refuses to take the action and a
> description of each evaluation procedure, assessment, record, or report the agency
> used as a basis for the proposed or refused action;
> (C) a statement that the parents of a child with a disability have protection under the
> procedural safeguards of this subchapter and, if this notice is not an initial referral for
> evaluation, the means by which a copy of a description of the procedural safeguards
> can be obtained;
> (D) sources for parents to contact to obtain assistance in understanding the provisions
> of this subchapter;
> (E) a description of other options considered by the IEP Team and the reason why
> those options were rejected; and
> (F) a description of the factors that are relevant to the agency's proposal or refusal.

20 U.S.C. § 1415(c)(1); 34 C.F.R. § 300.503(b).[2]  After the August 25, 2005 MDT meeting, the

MDT issued a PNOP for both Hamilton and Taft because it wanted Gales to have an opportunity

to visit both schools before making her decision.  A.R. 309.  Plaintiffs claim that "[t]he PNOP

issued on August 25, 2005 provides no . . . explanation," reason, procedural bases, or description

of other factors, for defendants' placement proposals or refusal as required by the regulations.

Pls.' Mot. at 10.  Plaintiffs assert, therefore, that this procedural violation renders defendants'

placement of T.T. at Hamilton "inappropriate."[3]  Id.

     Plaintiffs are correct that the two PNOPs issued -- one for Hamilton and the other for Taft

-- were wanting in some respects.  As the statute requires, the PNOPs included a description of

T.T.'s educational eligibility, setting, services to be received, and a statement that placement was

being changed from Payne to Hamilton and Taft, respectively.  A.R. 72, 73.  Form language

indicated that the recipient was "protected under the Procedural Safeguards for parents," and that

a copy of the safeguards was included.  Id.  The LEA special education coordinator was listed as

a contact for assistance regarding the Procedural Safeguards.  Id.  But the IDEIA also requires an

explanation of the action proposed or refused and a description of the documentary basis for that

decision.  The PNOPs here stated generally: "The MDT met to review all of the documentation

and the following setting was proposed for the student: outside of general education to meet the

---

[2] The Prior Notice of Placement ("PNOP") form used by DCPS appears to have been created on July 2, 2001.  Although that form obviously predated the 2004 amendments effectuated by the IDEIA, the notice requirements in the two versions of the statute are substantively identical.  Compare IDEA, 20 U.S.C. § 1415(c) (2000), with IDEIA, 20 U.S.C. § 1415(c)(1) (Supp. 2007).

[3] When Gales refused to choose between Hamilton and Taft before the start of the academic year, defendants unilaterally placed T.T. at Hamilton on the basis of its proximity to T.T.'s home and its ability to implement T.T.'s IEP.  A.R. 319, 321.

student's needs." Id.  This statement failed to provide a thorough, individualized explanation for the MDT's decision to move T.T. from Payne to Hamilton or Taft.  Moreover, the generalized reference to "all of the documentation" was an insufficient description of "each evaluation procedure, assessment, record, or report the agency used as a basis" for the action as required by the IDEIA.  20 U.S.C. § 1415(c)(1)(B).  The PNOPs' description of other options considered and explanation for their rejection was similarly vague: "Based on the documentation reviewed by the team at the MDT meeting, it was determined that the student could not be educated in general education setting or combination general education/special ed because of continued school failure."  A.R. 72, 73; § 1415(c)(1)(E).  Finally, the PNOPs failed to provide a description of other factors relevant to the action proposed by DCPS.  See § 1415(c)(1)(F); A.R. 72, 73.  The PNOPs, in sum, fell short of the specificity required by the IDEIA and its accompanying regulations.

These minor procedural failings, however, do not necessarily entitle plaintiffs to relief.  Rather, plaintiffs must show that the procedural violations affected T.T.'s substantive rights.  See Lesesne, 447 F.3d at 834.  They cannot make such a showing.  The record indicates that plaintiffs had a detailed understanding of defendants' reasons for placing T.T. at Hamilton or Taft.  For starters, Gales herself requested T.T.'s removal from Payne at the August 2, 2005 MDT meeting.  A.R. 270.  While the PNOPs may have lacked a robust explanation for T.T.'s removal from Payne, the MDT was acting, at least initially, pursuant to Gales's request.  Furthermore, Hamilton and Taft were presented as possible placements for T.T. in direct response to the setting that Gales had specified.  Compare A.R. 270 (Gales requesting a full-time, smaller, and more therapeutic setting for T.T. on August 2, 2005), with A.R. 70 (MDT presenting Hamilton and Taft

to Gales as full-time settings with small class sizes and full-time "social workers and

psychologist[s] on staff to provide counseling and crisis intervention" on August 25, 2005).

Defendants were not, at any point, unclear about T.T.'s possible or final placement, nor did they

attempt to conceal any information about the appropriateness of the schools' services. Gales was

given the address and phone number for both Hamilton and Taft so that she could visit each

school and make an informed decision as to which one T.T. would attend. Although Gales chose

not to visit either school, and never indicated her preference for one of them, A.R. 309, 318, she

had every opportunity to do so. Cf. Paolella, 210 App'x at 3-4 (implying that parent's visit to

potential placement site was relevant to parent's claim of meaningful participation and preference

for private school). Finally, Gales received an additional notice when the LEA special education

coordinator sent her a letter, dated September 2, 2005, informing her that T.T. would be placed at

Hamilton because of the school's ability to provide a FAPE. A.R. 46-47.

     Further demonstrating that Gales received adequate notice is the fact that she promptly

filed a due process complaint on September 6, 2005. See A.R. 31-35. The documents submitted

by plaintiffs as evidence at the October 31, 2005 due process hearing included a diagnostic

assessment, a psycho-educational report, a social work evaluation, teacher comments, and other

clinical reports. A.R. 62. Gales was not only aware of these documents, which had presumably

been used to develop T.T.'s IEP and identify appropriate placement, but also had access to the

documents in time to use them as exhibits during the due process hearing. Indeed, another judge

in this district has found that a plaintiff's prompt filing of a due process complaint, along with

representation by able counsel at the due-process hearing and submission of evaluations and

other reports as hearing exhibits, demonstrates "that the notice received . . . did not compromise

any of the parent's rights under the IDEA." Shaw, 238 F. Supp. 2d at 138. Such is the case here.

Because there is no evidence of substantive harm to T.T., the minor procedural violations that

defendants committed are not a sufficient basis to support plaintiffs' claim for relief. See, e.g.,

Roark, 460 F. Supp. 2d at 42 (finding that procedural violation did not affect the student's

substantive rights and therefore that the plaintiffs could not succeed on their procedural claims).

## C. Educational Benefit

In a mixed claim of substance and procedure, plaintiffs contend that the MDT was

improperly restricted by the SRC's placement options and unable to consider Gales's preference

for Accotink Academy. This limitation on the MDT, the argument goes, impeded the MDT's

ability to comply fully with the IDEIA. See Pls.' Mot. at 8-9; Pls.' Opp'n & Reply at 5. Plaintiffs'

contention in this regard suffers from both factual and legal flaws. As a factual matter, the

assertion that Gales's preference for Accotink Academy or the Kennedy Institute was not

considered finds little support in the record. On August 4, 2005, during another due-process

hearing on unrelated claims, "DCPS agreed to consider the parent's proposed placements at the

next MDT Meeting," and, in fact, was ordered to do so. A.R. 19, 20. Indeed, at the next MDT

placement meeting on August 25, 2005, "Accotink was considered [as an option, but was

ultimately rejected because] DCPS has [two] appropriate placements that they are offering that

can meet the student's needs." A.R. 71.

In a similar vein, plaintiffs' argument is legally flawed because defendants are not

required to consider private-school placement when appropriate public-placement options are

available. See Jenkins v. Squillacote, 935 F.2d 303, 305 (D.C. Cir. 1991) ("[I]f there is an

'appropriate' public school program available . . . the District need not consider private

placement, even though a private school might be <u>more</u> appropriate or better able to serve the child."). Although the IDEIA guarantees a FAPE, it "does not necessarily guarantee the child [with a disability] the best available education." <u>Holland v. District of Columbia</u>, 71 F.3d 417, 419 (D.C. Cir. 1995). Nor does the IDEIA ensure that a FAPE will consist of the precise plan that the parent desires. <u>See Shaw</u>, 238 F. Supp. 2d at 139. These established legal propositions are reflected in the District of Columbia Code, which imposes a strict order of priority for special-education placement: "(1) DCPS schools or District of Columbia public charter schools; (2) Private or residential District of Columbia facilities; and (3) Facilities outside of the District of Columbia." D.C. Code § 38-2501 (2000) (current version at D.C. Code § 38-2561.02(c) (2007)). A local government meets its federal and local statutory obligations to implement a student's IEP -- and thus provide a FAPE -- where public placement is "reasonably calculated to enable the child to receive educational benefits." <u>Rowley</u>, 458 U.S. at 207. Plaintiffs have pointed to no evidence in the record contradicting the MDT's view that T.T.'s IEP could be implemented at Hamilton and Taft, and the Court therefore concludes that placement at those public schools satisfied the statutory requirements.

This conclusion suffices to dispose of plaintiffs' substantive challenge to the placement decision.[4] The Supreme Court has held that local governments satisfy the statutory standard "by providing personalized instruction with sufficient support services to permit the child to benefit

---

[4] During the October 31, 2005, due process hearing, Gales took issue with Hamilton and Taft, stating that "Hamilton and Taft is strictly for, quote, unquote, outstanding behavior. My daughter do not have critical behavior. That's mainly what that school is for, not to meet my daughter's needs. My daughter needs, behavior is not outstanding." A.R. 337. Count I of the Complaint could be construed as a direct substantive challenge, and plaintiffs advance an argument to the same effect in their briefing. <u>See</u> Pls.' Opp'n & Reply at 5.

educationally from that instruction." Rowley, 458 U.S. at 203. During the August 25, 2005 MDT meeting, DCPS explained to Gales that both Hamilton and Taft "have full time social workers and psychologist on staff to provide counseling and crisis intervention. In addition, both schools offer small settings. There are no more than [nine] students to a class with a certified special education teacher and an aide." A.R. 70. As stated above, the Court finds this description of the schools' services consistent with a satisfactory provision of FAPE as stated in Rowley and applied in recent D.C. Circuit decisions. In Paolella, for example, the D.C. Circuit affirmed the district court's ruling that, even though the student's parent preferred a private-school placement, the designated public-school placement was appropriate because DCPS had a general familiarity with its programs and DCPS personnel had special education expertise requiring deference. 210 F. App'x at 3. Just as in this case, the parents in Paolella did not dispute that the public school selected could properly implement the student's IEP. Id. at 4. Plaintiffs here have offered no evidence to support a claim that the public schools chosen were unable to implement T.T.'s IEP. Accordingly, to the extent plaintiffs challenge the choice of Hamilton and Taft on substantive grounds, that challenge must fail.

**D. Rehabilitation Act Claim**

Plaintiffs' final claim, advanced somewhat obliquely in the Complaint and in their motion for summary judgment, is that defendants violated T.T.'s rights under § 504 of the Rehabilitation Act, 29 U.S.C. § 794. Section 504 prohibits programs and entities that receive federal funding from denying benefits to, or otherwise discriminating against, a person "solely by reason" of that individual's handicap. Id. § 794(a). This statute seems an odd fit for a setting in which local governments are charged with providing specialized education for disabled students. Courts have

-18-

recognized this incongruity and have thus required that plaintiffs claiming a violation of § 504 demonstrate "something more than a mere failure to provide the [FAPE]" mandated by the IDEIA.  See Lunceford v. District of Columbia Bd. of Educ., 745 F.2d 1577, 1580 (D.C. Cir. 1984) (citation omitted); Sellers v. Sch. Bd. of Manassas, Va., 141 F.3d 524, 529 (4th Cir. 1998); R.S. v. District of Columbia, 292 F. Supp. 2d 23, 28 (D.D.C. 2003).  Either bad faith or gross misjudgment on the part of the governmental defendants must be shown.  R.S., 292 F. Supp. 2d at 28; Walker v. District of Columbia, 969 F. Supp. 794, 797 (D.D.C. 1997); accord Sellers, 141 F.3d at 529.

     Plaintiffs have not come close to making the requisite showing.  Even when all plausible inferences are drawn in their favor, plaintiffs have not alleged any facts that would tend to prove that DCPS officials acted in bad faith or committed egregious errors of judgment.  Nor would the administrative record support any such allegations.  To the contrary, the record demonstrates that DCPS officials made continual (albeit imperfect) efforts to address Gales's concerns, to resolve the issue of T.T.'s placement, and to implement her IEP.  The allegations in the Complaint, again construed generously, might possibly support a negligence claim.  But courts have sensibly required something more than the allegations of negligence that are raised in plaintiffs' Complaint, if at all, only tacitly.  See Sellers, 141 F.3d at 529 (affirming dismissal of Rehabilitation Act claim where the complaint presented "at best, a negligence claim").  Plaintiffs' claim accordingly fails as a matter of law, and defendants are entitled to judgment on it.

     There is one procedural complication.  As mentioned above, plaintiffs did not develop their claim under § 504, and defendants understandably overlooked that claim and failed formally to seek summary judgment on it.  Their failure to make the appropriate motion does not,

-19-

however, preclude the Court from resolving this plainly meritless claim.  Rather, the Court may,

and will, dismiss plaintiffs' Rehabilitation Act claim <u>sua</u> <u>sponte</u> for failure to state a claim upon

which relief can be granted.  <u>See</u> Fed. R. Civ. P. 12(b)(6); <u>Best v. Kelly</u>, 39 F.3d 328, 331 (D.C.

Cir. 1994).  Under the law of this circuit, a district court can dismiss a claim <u>sua</u> <u>sponte</u> under

Rule 12(b)(6) "where it is clear that 'the claimant cannot possibly win relief.'"  <u>P & V Enter. v.</u>

<u>U.S. Army Corps of Eng'rs</u>, 466 F. Supp. 2d 134, 150 (D.D.C. 2006) (quoting <u>Baker v. Dir., U.S.</u>

<u>Parole Comm'n</u>, 916 F.2d 725, 726 (D.C. Cir. 1990)).  So long as the plaintiff cannot possibly

win relief on the dismissed claim, the court need not grant the plaintiff leave to amend the

complaint.  <u>See</u> <u>Razzoli v. Fed. Bureau of Prisons</u>, 230 F.3d 371, 377 (D.C. Cir. 2000).  That is

precisely the situation presented in this case, where the administrative record simply does not

support a finding that defendants acted in bad faith or committed any gross misjudgments.  No

amendment to the Complaint could cure that deficiency.  Plaintiffs' claim under § 504 will

therefore be dismissed for failure to state a claim upon which relief can be granted.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court denies plaintiffs' summary judgment motion, grants

defendants' cross-motion for summary judgment, and dismisses <u>sua</u> <u>sponte</u> plaintiffs' claim under

the Rehabilitation Act.  A separate order has been posted on this date.

/s/

JOHN D. BATES<br>
United States District Judge

Dated:   July 23, 2007

-20-